UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————————

JOSE BENIQUEZ,

                              Petitioner,                 21 Civ. 1467 (PAE)

                    -v-                                    OPINION & ORDER

JAY JOHNSON,

                              Respondent.

————————————————————————————

PAUL A. ENGELMAYER, District Judge:

        On February 18, 2021, petitioner Jose Beniquez filed a *pro se* petition for a writ of habeas

corpus under 28 U.S.C. § 2254 against his warden, Jay Johnson.  Dkt. 2 ("Pet.").  Beniquez

challenges the January 25, 2017 judgment of conviction entered by the New York State Supreme

Court in Manhattan after a trial by jury, which found him guilty of second-degree murder in

violation of New York Penal Law ("NYPL") § 125.25(1), second-degree conspiracy in violation

of NYPL § 105.15, first-degree assault in violation of NYPL § 120.10(1), and first-degree gang

assault in violation of NYPL § 120.07.  *Id.* at 1[1]; *id.*, Ex. A.  Beniquez is currently serving a

sentence of 20-years'-to-life imprisonment at Green Haven Correctional Facility in Stormville,

New York.  *See id.* at 1.  His convictions arise from a retaliatory gang attack that led to the

murder of Glenn Wright, a 21-year-old bystander whom a gang member confused for the

attack's target and stabbed to death, while Wright was cleaning his grandmother's windows.

        Beniquez's petition makes six arguments for relief: (1) that his convictions for murder

and conspiracy in the second degree were not supported by legally sufficient evidence; (2) that

———————————

[1] All page numbers refer to documents' Bates-stamped page numbers, with the exception of the
Petition, which has only internal page numbering.

his convictions were against the weight of the evidence; (3) that the prosecutor's opening and summation statements deprived him of his right to a fair trial; (4) that unobjected-to testimony eliciting a sanitized version of an accomplice's out-of-court statement violated his right, under the Sixth Amendment as incorporated by the Fourteenth Amendment, to confront a witness against him; (5) that he was denied his state and federal constitutional right to effective assistance of counsel; and (6) that, at sentencing, the court erred in determining his predicate felony offender status, and imposed a sentence that was harsh and excessive. *Id.* at 5–8. The respondent—to whom the Court refers as "New York State" or "the State"—opposes the Petition in its entirety. Dkt. 14 ("Opp.").

For the reasons that follow, the Court denies the Petition.

## I.      Background

### A.      Facts

On September 12, 2009, members of the Aztec chapter of the Latin Kings ("the Aztecs"), a street gang that operated out of Manhattan's Lower East Side, Dkt. 13-2 at 8, murdered Wright. Dkt. 13-7 ("330.30 Decision") at 2. As Aztecs member Jason Quijano testified, the Latin Kings were a national organization with many chapters, including three in Manhattan, each of which was administered by three "crowns," numbered in descending order of importance. Dkt. 15-1 at 131–50; Opp. at 12. In September 2009, Beniquez was "first crown"—the highest-ranking member—of the Aztec chapter. Dkt. 15-1 at 150. Beniquez was also a "prince" of the other two Manhattan chapters, a title that gave him authority over those chapters, too. *Id.* In these roles, Beniquez authorized or vetoed "missions" against rivals. *Id.* at 150–52.

Earlier on September 12, 2009, members of the gang, including Beniquez, had met in Tompkins Square Park. *Id.*; *see also* 330.30 Decision at 2. Raphael Esquilin, who was a

"warlord in the [gang] and was in charge of weapons and warfare," and Miguel Gonzalez, who was "second crown," were also present.  Dkt. 15-1 at 151.  Esquilin first spoke privately spoke to Gonzalez and Beniquez.  *Id.* at 152–53; 330.30 Decision at 2.  Esquilin—whose son allegedly had been robbed by members of a rival gang—then spoke to the larger group.  Dkt. 15 at 460–63; Dkt. 15-1 at 152–53.  Flanked by Beniquez and Gonzalez, Opp. at 9, Esquilin told the group he was "tired of putting in all this work, someone has to step up," 330.30 Decision at 2–3 (quoting trial transcript).

Three other gang members were at the meeting: Joel Herrera, Alan Silva, and Jason Quijano.  *See* Opp. at 12–13.  Herrera volunteered to "step up."  330.30 Decision at 3.  He was given a knife by another person in the group.  The group then split in two, with seven members walking down one side of the street and another seven following half a block behind on the opposite side.  *Id.*  They walked toward the Baruch Houses, where the target of the attack was allegedly located.  *Id.*  As they walked, the gang members communicated by cell phone; evidence of these calls was presented by the prosecution.  *Id.*  Several of those calls were between Beniquez and Herrera.  *Id.*; *see, e.g.*, Dkt. 13-2 at 31–34 (describing calls).

At the time the Aztecs arrived at the Baruch Houses, Wright, who was visiting his grandmother at the Houses, was standing outside her first-floor apartment washing her windows.  Opp. at 9.  Mistaking Wright for the intended target, Herrera stabbed Wright twice in the neck, severing his carotid artery.  *Id.*; 330.30 Decision at 4.

After the stabbing, the Aztecs fled.  Quijano—who was acting as a lookout at the edge of the Baruch Houses—received a call from Beniquez telling him to flee.  Opp. at 9.  Police stopped and arrested Beniquez, Herrera, Silva, and others as they fled north from the stabbing scene.  *Id.*; *see also* Dkt. 15 at 522–53; Dkt. 15-1 at 16.  At the time he was stopped, Herrera was covered in

what turned out to be Wright's blood.  Opp. at 9.  While Silva was under arrest and at the

precinct, he gave a statement to since-retired New York City Police Department ("NYPD")

detective Kevin Madden that Beniquez had directed Silva "to be on point," that is, to act as a

"look-out."  Dkt. 15 at 541.  Madden recorded this statement in a DD5, a form NYPD detectives

use "whenever [they] do any interviews or make any notes regarding the case" that are then

stored and indexed in a computer case management system.  Dkt. 15-1 at 19, 67.

Wright died that night from his wounds.  *Id.*

### B.   Procedural History

#### 1.   Trial

On July 18, 2014, a grand jury returned an indictment charging Beniquez, Gonzalez, and

Esquilin with murder in the second degree, manslaughter in the first degree, assault in the first

degree, and gang assault in the first degree.  Dkt. 13-2 at 10.  Beniquez, Gonzalez, Esquilin,

Herrera, and Silva were also charged with conspiracy in the second degree.  *Id.*  On November 9,

2015, Beniquez and Gonzalez proceeded to a jury trial before the Hon. Daniel P. FitzGerald.  *Id.*;

*see also* Opp. at 8, 10.  Beniquez was represented by Patrick Brackley, Esq.  *See* Dkt. 15 at 2.

Aspects of the trial testimony of Detective Madden and Quijano, both called by the

prosecution, are relevant here.

Before Detective Madden took the stand, the prosecution notified the Court of its

intention to offer—as a statement against penal interest—a statement Silva had made to Madden

at the precinct in the hours after the murder to the effect that Silva had been directed to be a look-

out by "a senior or older member of the gang."  Opp. at 37.  This statement, the prosecutor

explained, was in sanitized form, so as to leave out the identity of the person (Beniquez) who

Silva had told Madden had given him that direction.  Dkt. 15 at 541; Dkt. 15-1 at 1.  Beniquez's

attorney, Brackley, did not object.  Dkt. 15-1 at 1–5.  Gonzalez's attorney did object, arguing that "[t]here are issues of confrontation," "[*Bruton*] and *Cruz* issues," and that the sanitized statement was more harmful to Gonzalez than the actual statement.  *Id.* at 1–4 (italics added).

To resolve the dispute, the Court proposed that Madden testify merely that Silva had stated to him, "My job was to be a lookout that day."  *Id.* at 4–5.  Gonzalez's attorney consented to that approach, provided that Silva's unavailability was established.  Beniquez's attorney, Brackley, again did not object.  *Id.* at 4–6.  During a break in Madden's ensuing testimony, Silva's attorney, outside the presence of the jury, confirmed to the Court that Silva was unavailable.  He explained that, although Silva had pled guilty to charges in connection with the Wright murder, he had not yet been sentenced, his case was still pending, and, if called, Silva "definitely [would] not testify" and would invoke his Fifth Amendment right to decline to do so.  *Id.* at 48–50.

A sidebar ensued at which the Court and counsel reviewed the testimony the prosecution would be permitted to elicit from Madden.  The prosecutor, apparently referencing an earlier discussion not memorialized in the transcript, pointed to language in one of Madden's DD5 reports around which the court had "put [a] pencil mark."  *Id.* at 49–50.  The Court instructed the prosecutor to "explain to Madden not to vary from [that] script."  *Id.* at 50.  Neither defense counsel objected.  Madden thereafter testified that, when he interviewed Silva after the stabbing, Silva said:  "I was met with a guy with long hair and a hoody.  I was told to be the lookout when the guy with the hoody walked away."  *Id.* at 67.

Quijano testified that he had pled guilty to manslaughter and assault in connection with Wright's killing, and that, although he otherwise would have faced a prison term of 25 years, under a cooperation agreement he had entered into with the prosecution, he would be sentenced

to five years' imprisonment provided he testified truthfully. *See, e.g.*, Dkt. 15-1 at 175–78 (discussing agreement); *see also id.* at 118, 211. Quijano had been released from prison several months earlier, having served five years. *Id.* at 118. Quijano testified that he had joined the Aztecs in 1996 at age 23 and had known Beniquez since. *Id.* at 130. Quijano had reached the rank of "pearl" in the Aztec chapter; in that capacity, he provided security for gang meetings. *Id.* at 136. In 2002, after becoming disillusioned with internal politics in the Aztecs chapter, Quijano cut ties with the gang. *See, e.g.*, *id.* at 137, 140–42. However, in summer 2009, Quijano contacted Beniquez's sister about rejoining the Aztecs. *Id.* at 143–45. Beniquez welcomed him back. *Id.* at 147 ("There was no hostility, nothing like that."); *see id.* at 145–47.

Quijano testified to the Aztecs' organizational structure and Beniquez's role as first crown and prince. *Id.* at 148–52. He recounted the September 12, 2009 meeting in Tompkins Square Park. He stated that Beniquez had stood near Esquilin while Esquilin asked another member to "step up." *Id.* at 155. He testified that he had observed Herrera accept the mission and that he had seen a knife "surface[]," although he could not tell definitively from where it had come. Dkt. 13-1 at 18; Dkt. 15-1 at 155. Quijano testified that there had not been a formal discussion among the group of the plan from there, except that Beniquez had "suggested" that, to avoid suspicion, the group split in two before heading to the Baruch Houses. Dkt. 15-1 at 156 (Beniquez said "[w]e can't be on the same block"); *see id.* at 155–57. Quijano testified that, as the groups headed toward the Baruch Houses, Beniquez told him, "[L]isten, we don't know what's going to happen," but "[w]e went with enough numbers to prepare ourselves for whatever opposition was there," and that the members had a getaway driver. *Id.* at 159.

On November 24, 2015, the jury returned verdicts of guilty against both defendants. Opp. at 14. Gonzalez was convicted of first-degree manslaughter, first-degree assault, first-

degree gang assault, and fourth-degree conspiracy. *Id.* at 14 n.5. Beniquez was convicted of

murder in the second degree, conspiracy in the second degree, assault in the first degree, and

gang assault in the first degree. *Id.* at 14.

### 2.    The 330.30 Motion

On July 29, 2016, Beniquez, through Brackley, moved under New York Criminal

Procedure Law ("CPL") § 330.30 to set aside his convictions for murder in the second degree

and conspiracy in the second degree, on the grounds that the evidence that he had intended to

murder Wright was insufficient. 330.30 Decision at 4; *see also* Opp. at 15. On December 15,

2016, the motion was denied. *See* 330.30 Decision at 10.

On January 25, 2017, Beniquez was sentenced. Dkt. 15-1 at 452–66. Before sentencing,

Beniquez was arraigned as a second-felony offender, based on his prior conviction of attempted

criminal possession of a weapon in the third degree. *Id.* at 452–55. The Government filed a

statement of predicate felony conviction in support. Dkt. 13-16 at 1. Beniquez did not dispute

the fact or validity of that conviction. Dkt. 15-1 at 453–54.

### 3.    Direct Appeal

In June 2018, Beniquez—now represented by new counsel Marianne Karas, Esq.—

appealed. *See* Dkt. 13-1 at 70. In arguments that largely track those made here, he argued that

(1) insufficient evidence supported his convictions for second-degree murder and conspiracy;

(2) all of his convictions were against the weight of the evidence; (3) Quijano's testimony was

improperly admitted, including because it contained inadmissible hearsay and recounted co-

conspirator statements without a *prima facie* showing of a conspiracy having been made;

(4) Madden's testimony as to Silva's statement violated Beniquez's Sixth Amendment right to

confront a witness against him; (5) Beniquez was deprived of his right to effective assistance of

counsel due to various lapses by his trial counsel, Brackley, including in failing to object to inadmissible hearsay, co-conspirator statements, and the sanitized version of Silva's statements; and (6) the sentences were harsh and excessive.

On October 1, 2019, the Appellate Division, First Department, unanimously affirmed Beniquez's conviction and sentence.  *People v. Beniquez* ("*Beniquez I*"), 176 A.D.3d 406 (1st Dep't 2019).  As to Beniquez's claims of evidentiary sufficiency, it held these had not been preserved, save as to Beniquez's challenge to the evidence of his intent to kill.  *Id.*  In any event, the Appellate Division found there was sufficient evidence to support each count of conviction. *Id.*  The Appellate Division likewise rejected Beniquez's argument that his convictions were against the weight of the evidence.  *Id.*  As to Beniquez's challenge to Quijano's testimony, the Appellate Division found "no basis for disturbing the jury's credibility determinations"; it noted that "extensive evidence," "including police testimony and cell phone records," corroborated this testimony, rendering the overall proof "overwhelming."  *Id.* at 407.  The Appellate Division also rejected Beniquez's ineffective assistance of counsel challenge for two reasons.  First, it had not been preserved and, as "it involve[d] matters not reflected in, or fully explained by, the record," was unreviewable on direct appeal.  *Id.*  Second, and alternatively, "to the extent the existing record permits review," Beniquez "received effective assistance under state and federal standards."  *Id.*  Finally, the Appellate Division found "no basis" for reducing Beniquez's sentences.  *Id.*

On October 2, 2019, Beniquez, through counsel, requested leave to appeal to the Court of Appeals.  Dkt. 13-5.  On December 4, 2019, the Court of Appeals denied leave to appeal.  *People v. Beniquez* ("*Beniquez II*"), 34 N.Y.3d 1075 (2019).

### 4.    Article 440.10 Motion

On February 19, 2021,[2] Beniquez, *pro se*, filed a motion pursuant to CPL § 440.10 to vacate his conviction and sentence.  Dkt. 13-8 ("Article 440.10 motion").  Beniquez moved on four grounds: (1) that his conviction for intentional murder and conspiracy in the second degree were based on legally insufficient evidence, perjured testimony, circumstantial evidence, and that the prosecutor's failure to disclose Quijano's plea agreement violated *Brady v. Maryland*, 373 U.S. 83 (1963); (2) that his conviction was against the weight of the evidence; (3) that the prosecutor deprived Beniquez of a fair trial by inflaming the jury's emotions, implying, without an evidentiary basis, that Beniquez was a gang member, and bolstering Quijano's testimony; and (4) that the sentence was harsh and excessive, and that he was improperly sentenced as a second violent felony offender.  *Id.* at 5–7.

In an order dated June 2, 2021, and recorded the following day, the New York State Supreme Court denied the motion.  Dkt. 13-10.  On July 21, 2021, the court reissued its order citing the Appellate Division's unanimous affirmance of Beniquez's conviction and sentence on his direct appeal.  *See* Dkt. 13-11 (citing *Beniquez I*, 176 A.D.3d at 406).

On July 29, 2021, Beniquez moved under CPL 460.15 for leave to appeal the denial of his Article 440.10 motion.  *See* Dkt. 13-12 at 11–18.  He faulted the state supreme court for having "rubber stamp[ed]" the denial of his motion.  *Id.* at 16.  In a decision entered October 21, 2021, the Appellate Division denied leave to appeal.  Dkt. 13-13.  It found "no question of law or fact presented which ought to be reviewed."  *Id.* at 1.  On November 3, 2021, Beniquez sought leave to appeal the Appellate Division's denial from the New York Court of Appeals.  Dkt. 13-

---

[2] Beniquez's motion is dated January 29, 2021, *see, e.g.*, Dkt. 13-8 at 4, but stamped as received by the Supreme Court on February 19, 2021, *id.* at 3.

14.  On December 28, 2021, the Court of Appeals denied leave to appeal, stating that "the order sought to be appealed from is not appealable under CPL § 450.90(1)."  Dkt. 13-15 at 1.

## 5.    The Instant Petition Under § 2254

On February 18, 2021, while his Article 440.10 motion was pending, Beniquez filed the instant *pro se* petition under 28 U.S.C. § 2254.  Dkt. 2.  On March 1, 2021, the Court granted Beniquez's application, Dkt. 1, to proceed *in forma pauperis*, Dkt. 3.  On March 23, 2021, the Court ordered New York State to answer the Petition.  Dkt. 5.

On April 5, 2021, Beniquez moved to hold the Petition in abeyance during the pendency of his Article 440.10 motion in state court.  Dkt. 7.  On April 30, 2021, New York State consented to the stay and asked that its answer be due 60 days after the conclusion of the state litigation.  Dkt. 9.  On May 3, 2021, the Court granted Beniquez's motion and the State's request.  Dkts. 10, 12.

On February 24, 2022, within 60 days of the Court of Appeals' denial of leave to appeal, Dkt. 13-15, New York State timely opposed the Petition, Dkt. 14, and filed state court materials, Dkt. 13, and the state court transcript, Dkts. 15, 15-1, in support.  On April 4, 2022, the State notified the Court that, in October 2021, Beniquez had filed a separate, second Article 440.10 motion under CPL § 440.20 in New York Supreme Court in Manhattan ("second Article 440.10 motion"), Dkt. 17, which it attached as an exhibit, Dkt. 17-1.  This second Article 440.10 motion challenged Beniquez's conviction on four grounds distinct from those raised in the instant Petition.  *Id.*  These were that: (1) Beniquez's sentence was unauthorized by statutory law; (2) the indictment, jury charges, verdict sheet, and sentence at trial violated CPL § 330.40(3)(b); (3) the verdict sheet was defective under CPL § 310.20; and (4) Beniquez was entitled to a hearing under *People v. Zeh*, 22 N.Y.3d 1144 (2014).  *Id.* at 6.

On February 10, 2023, the Court clarified, in response to a letter from Beniquez seeking to maintain the stay, Dkt. 23, that the stay had been lifted.  *See* Dkt. 24.  The Court explained that the second Article 440.10 motion was not a basis for continuing to stay the pending Petition.  *Id.* On March 24, 2023, Beniquez disputed that his Article 440.10 motion had been resolved, stating that his Article 440.10 motions were "allegedly consolidated" and still pending before the Court of Appeals and requesting a "distinct answer" as to whether the stay remained in place.  Dkt. 25. Later that day, the Court reiterated that the stay had been lifted in light of the Court of Appeals' December 28, 2021 denial of leave to appeal; explained that the second Article 440.10 motion, even if pending, did not affect the § 2254 petition, and ordered the State to file a letter confirming the current status of Beniquez's state court proceedings.  Dkt. 26.  On March 28, 2023, the State did so, confirming that Beniquez's Article 440.10 petition was no longer pending. It further noted that, although Beniquez claimed to have filed the second Article 440.10 motion in October 2021, there was no record of its having been "received by, or calendared in, Supreme Court, New York County, and [it] [was] not currently being reviewed by any New York state court."  Dkt. 27.  In any event, the State argued, the second Article 440.10 motion, whatever its status, did not justify a continued stay of the pending § 2254 petition.  *Id.*  That same day, the Court again confirmed that the stay had been lifted.  Dkt. 28.

## II.      Applicable Legal Standards

### A.      Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), for a writ of habeas corpus under 28 U.S.C. § 2254 to be granted on a claim that was adjudicated on the merits in state court, that claim must have "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "A claim is 'adjudicated on the merits' if the state court ruled on the substance of the claim rather than on a procedural ground." *Jordan v. Lamanna*, 33 F.4th 144, 150 (2d Cir. 2022) (citing *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001)), *cert. dismissed*, 143 S. Ct. 992 (2023).

"A decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* (alterations in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). And "[a] decision is an 'unreasonable application' of clearly established federal law 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (alterations in original) (quoting *Williams*, 529 U.S. at 413). The writ should be granted on grounds of unreasonableness only if "the state court's ruling on the claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 151 (alteration omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). "In other words, the existence of reasonable arguments on both sides is all the government needs to prevail in an AEDPA case." *Id.* (internal quotation marks and alterations omitted).

### B.      Adequate and Independent State Grounds

"A federal habeas court will not review a claim rejected by a state court 'if the decision of the state court rests on a state law ground that is independent of the federal question and

adequate to support the judgment.'" *Beard v. Kindler*, 558 U.S. 53, 55 (2009) (alterations omitted) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). "This rule applies whether the state law ground is substantive or procedural." *Coleman*, 501 U.S. at 729. "However, the state law ground is only adequate to support the judgment and foreclose review of a federal claim if it is 'firmly established and regularly followed' in the state." *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir. 2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).

"Since the adequacy of a state procedural bar to the assertion of a federal question is itself a federal question, [the court] must ascertain whether the state rule at issue . . . is firmly established and regularly followed, and further whether application of that rule in this case would be exorbitant." *Id.* at 714 (internal citations omitted). "To do so, [the court] looks at the statute and case law construing it." *Id.*

The adequate and independent grounds doctrine does not, however, bar relief where "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Smith v. Lee*, No. 11 Civ. 8376 (PAE), 2013 WL 2467988, at *11 (S.D.N.Y. June 7, 2013) (quoting *Coleman*, 501 U.S. at 750). A court may excuse a procedural default only "if the petitioner demonstrates either cause for the default and actual prejudice from the alleged violation of federal law, or that the failure to consider the claims will 'result in a fundamental miscarriage of justice.'" *Acosta v. Giambruno*, 326 F. Supp. 2d 513, 520 (S.D.N.Y. 2004) (quoting *Coleman*, 501 U.S. at 750). In this context, "cause" means "'some objective factor external to the defense [that] impeded counsel's efforts' to raise the claim in state court." *Id.* (quoting *McCleskey v. Zant*, 499 U.S. 467, 493 (1991)). "[A]ctual prejudice" requires the petitioner to show "actual and substantial disadvantage, infecting his entire trial with

13

error of constitutional dimensions." *Id.* (quoting *United States v. Frady*, 456 U.S. 152, 170

(1982)).  "A miscarriage of justice occurs 'in an extraordinary case, where a constitutional

violation has probably resulted in the conviction of one who is actually innocent[].'" *Id.*

(quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).  "To establish actual innocence,

petitioner must demonstrate that 'in light of all the evidence,' 'it is more likely than not that no

reasonable juror would have convicted him.'" *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002)

(quoting *Bousley v. United States*, 523 U.S. 614, 623–24 (1998)).

### C. Exhaustion

Section 2254 "generally requires a petitioner for a writ of habeas corpus to show that he

has 'exhausted the remedies available in the courts of the State' in order for the writ to be

granted." *McCray v. New York*, 573 F. App'x 22, 23 (2d Cir. 2014) (quoting 28 U.S.C.

§ 2254(b)(1)(A)); *see also Landy v. Costello*, 141 F.3d 1151, 1998 WL 105768, at *1 (2d Cir.

Mar. 9, 1998) (unpublished) ("[F]ailure to exhaust [state law remedies] would, of course, bar

habeas relief.").  "Exhaustion of state remedies requires that a petitioner fairly present federal

claims to the state courts in order to give the state the opportunity to pass upon and correct

alleged violations of its prisoners' federal rights." *McCray*, 573 F. App'x at 23 (quoting

*Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011)).  To fulfill the exhaustion requirement, a

petitioner must have presented the substance of his federal claims "to the highest court of the

pertinent state." *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (quoting *Pesina v. Johnson*,

913 F.2d 53, 54 (2d Cir. 1990)).

In New York, a petitioner may exhaust his claims by filing a direct appeal to the relevant

Appellate Division and seeking leave to appeal to the New York Court of Appeals.  *Olsen v.*

*Doldo*, No. 16 Civ. 5366 (RA) (DF), 2020 WL 685707, at *16 (S.D.N.Y. Jan. 2, 2020), *report*

*and recommendation adopted*, 2020 WL 635605 (S.D.N.Y. Feb. 11, 2020).  "New York procedural rules bar its state courts from hearing either claims that could have been raised on direct appeal but were not, or claims that were initially presented on appeal but were not presented to the Court of Appeals."  *Sparks v. Burge*, No. 06 Civ. 6965 (KMK) (PED), 2012 WL 4479250, at *4 (S.D.N.Y. Sept. 28, 2012); *see* CPL § 440.10(2)(c).

"Where a claim is not appropriate for direct appeal because it cannot be demonstrated on the basis of the pretrial or trial record . . . a petitioner may exhaust the claim by raising it to the state trial court in a collateral post-conviction motion, such as a motion pursuant to New York Criminal Procedure Law § 440."  *Elleby v. Smith*, No. 20 Civ. 2935 (PAE), 2020 WL 2611921, at *3 (S.D.N.Y. May 22, 2020), *adhered to on denial of reconsideration*, 2020 WL 4058957 (S.D.N.Y. July 20, 2020).  "If that motion is denied, [the petitioner] must then seek leave to appeal to the Appellate Division in order to exhaust his state court remedies."  *Moreno-Gratini v. Sticht*, No. 19 Civ. 05964 (GHW) (SN), 2022 WL 1425712, at *7 (S.D.N.Y. Apr. 18, 2022), *report and recommendation adopted*, 2022 WL 1423298 (S.D.N.Y. May 5, 2022); *see* CPL § 450.90; *see also Cosey v. Lilley*, 460 F. Supp. 3d 346, 370 (S.D.N.Y. 2020) (noting that no further appellate review is available after Appellate Division denies leave to appeal denial of § 440.10 motion).

Although a court cannot grant an unexhausted claim, it may, pursuant to § 2254(b)(2), deny the petition on the merits.  *Abuzaid v. Mattox*, 726 F.3d 311, 321 (2d Cir. 2013).

## III.    Discussion

The Court addresses the six grounds for relief raised in the Petition in turn.

### A.    Challenge to Sufficiency of the Evidence

Beniquez's first claim is that there was insufficient evidence to support his convictions for murder and conspiracy in the second degree. Pet. at 5–6. Beniquez raised this claim, under both federal and state constitutional law, in his direct appeal. *See, e.g.*, Dkt. 13-1 at 31; *see also Beniquez I*, 176 A.D.3d at 406. And he renewed that claim in his 440.10 motion. *See* Article 440.10 Motion at 24–31. Accordingly, Beniquez has adequately exhausted this claim so as to permit review under § 2254. *Moreno-Gratini*, 2022 WL 1425712, at *7.

However, Beniquez's insufficiency claim is preserved only to the limited extent that he argues the evidence of his intent to kill was insufficient. At trial, Beniquez did not argue that the evidence was otherwise insufficient. He instead limited his insufficiency claim to that one discrete point. *See, e.g.*, Dkt. 15-1 at 294–95 ("[T]here was no plan to commit murder. There was no plot to commit murder. . . . No one was supposed to die."). The trial court denied that motion. *Id.* at 295. On direct appeal, Beniquez broadened his insufficiency challenge so as to generally challenge the sufficiency of the evidence of second-degree murder and conspiracy. *See* Dkt. 13-1 at 23–30. But the Appellate Division, in affirming Beniquez's conviction, held that, "[e]xcept for Beniquez's argument that the People failed to establish his intent to kill, which we find unavailing, both [his] legal insufficiency claims are unpreserved," and, in the "alternative," those verdicts were "supported by legally sufficient evidence." *Beniquez I*, 176 A.D.3d at 406.

The Appellate Division's decision narrows the Court's authority to review under § 2254 Beniquez's insufficiency claim. That is because federal habeas review is foreclosed "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990). "This is true even where, as in the instant case, the state court [also] reaches the merits of a claim in an alternative holding." *McPherson v. Keyser*, No. 20-161-PR, 2021 WL 4452078, at *2 (2d Cir. Sept. 29, 2021) (internal quotation

marks and alterations omitted), *cert. denied*, 142 S. Ct. 1235 (2022).  Decisive here, the New York Court of Appeals has "held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule."  *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) (collecting cases) (discussing CPL § 470.05(2)).  And Beniquez has not shown that a miscarriage of justice occurred so as to avoid this bar.  Such would require a demonstration of either cause and prejudice or of actual innocence.  *See Bousley*, 523 U.S. at 623 ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency."); *see also Calderon v. Thompson*, 523 U.S. 538, 559 (1998) ("To be credible, a claim of actual innocence must be based on reliable evidence not presented at trial." (internal quotation marks omitted)).  Accordingly, Beniquez's bid to challenge broadly the sufficiency of the evidence supporting his murder and conspiracy convictions is procedurally barred.  *McPherson*, 2021 WL 4452078, at *2 (insufficiency claim procedurally barred).  The Court thus considers only Beniquez's challenges to these convictions based on the evidence of his intent to kill.

As to that issue, Beniquez's claim fails on its merits.  The Appellate Division, reaching the merits, so held.  *See Beniquez I*, 176 A.D.3d at 406 (stating convictions "supported by legally sufficient evidence").  And where a state appellate court's ruling resolved a claim on the merits, this Court's review is conducted under § 2254(d)'s deferential standard.  *McPherson*, 2021 WL 4452078, at *3 (where "the appellate court['s] ruling[] indicate[s] merits consideration, we may assume without deciding that there was an 'adjudication on the merits' in the state courts, and analyze whether habeas relief is warranted under the deferential § 2254(d) standard" (internal alterations and quotation marks omitted)).

Applying that standard, the Court finds that the Appellate Division reasonably applied clearly established federal law in rejecting Beniquez's challenge to the sufficiency of the

17

evidence of his intent to kill.  Under that law, a petitioner challenging the sufficiency of the evidence "bears a heavy burden."  *United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010).  The court is to "view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility."  *Id.*  The court must "evaluate the evidence in its totality and uphold the jury's verdict as long as '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Id.* (internal quotation marks and citations omitted) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  "This inquiry is distinct from asking whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt."  *Id.* (quoting *Jackson*, 443 U.S. at 318–19).  In assessing the sufficiency of the evidence in the context of a conspiracy conviction, "deference to the jury's findings is especially important because conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court."  *Id.* (internal alterations omitted).

The issue thus is whether, based on the evidence at trial, a rational juror could find that Beniquez acted with "intent to cause the death of another person."  *See* NYPL § 125.25(1).  The answer, as found by the Appellate Division, is yes.  At trial, the prosecution adduced Quijano's testimony that Beniquez led the Aztecs chapter of the Latin Kings; that he had authority to approve or abort planned missions; that he was at the Tompkins Square Park meeting at which the retaliatory attack was planned; that he knew Herrera was armed with a knife; that, far from attempting to stop the mission, Beniquez instructed the gang how to proceed to the Baruch Houses strategically, and ensured that the gang members had "enough numbers to prepare ourselves for whatever opposition was there" and that the assailants had a getaway driver, Dkt. 15-1 at 159; that he accompanied his fellow gang members to the Baruch Houses; and that,

immediately after Herrera slashed Wright's throat, Beniquez fled the scene, *see* Dkt. 13-2 at 40–54.  This testimony was corroborated, in various respects, by disparate evidence, including similarities in Beniquez, Herrera, Silva, and another gang member's attires, upon their arrest, Dkt. 15 at 494–505; cell phone records and cell site maps reflecting communications among the gang members, including Beniquez, Dkt. 13-2 at 46–47; testimony from a law enforcement witness explicating those cell site records, Dkt 15-1 at 90–102; and testimony from police officers, *see, e.g.*, Dkt. 15 at 494–505, detectives, *see, e.g.*, Dkt. 15-1 at 40–72, Esquilin's son, *id.* at 460–65, and Wright's father, *id.* at 473–93.  The jury was entitled to credit Quijano's testimony, and had particularly good reason to do so given this varied corroboration.  A juror crediting Quijano's testimony could rationally find that the brutal and premeditated knife attack by Herrera had been planned and coordinated by the Aztecs' leadership, headed by Beniquez, with the intent to kill a perceived gang rival.  And the alternative theory that Herrera acted *ultra vires*—on his own—in knifing Wright's throat, in contrast, lacked an evidentiary basis.

The evidence thus gave the jury a rational basis on which to conclude that a conspiracy existed whose object was to kill a gang rival and that Beniquez, Herrera, and others participated in the conspiracy with the required *mens rea*.  *See People v. Molina*, 914 N.Y.S.2d 331, 337–38 (3d Dep't 2010) (intent element of second-degree murder may be inferred from his actions and surrounding circumstances), *leave to appeal denied*, 16 N.Y.3d 861 (2011); *see also Reddy v. Coombe*, 846 F.2d 866, 869 (2d Cir. 1988) (federal habeas court must "credit every inference that could have been drawn in the State's favor, whether the evidence being reviewed is direct or circumstantial" (internal citations omitted)).

Accordingly, the Court denies Beniquez's § 2254 petition to the extent that it is based on the claim that his murder and conspiracy convictions rested on legally insufficient evidence.[3]

### B.      Challenge to Madden's Testimony About Silva's Out-of-Court Statement

Beniquez next claims that Detective Madden's testimony about Silva's out-of-court statement was improperly admitted.  He does not dispute that the statement was properly received under the hearsay rules as a statement against Silva's penal interest.  Pet. at 7.  He claims, however, that receipt of that statement violated his right under the Confrontation Clause of the Sixth Amendment.  *Id.*  The State counters that this claim is procedurally barred and meritless, and, in the alternative, that any error was harmless.  Opp. at 35–44.

As reviewed above, the prosecution at trial was permitted to elicit from Madden a sanitized version of Silva's statement that Beniquez had told him to act as a "look-out" during the attack.  Dkt. 15 at 541.  Madden's testimony was that Silva stated "a guy with long hair and a hoody" gave him the instruction.  *See* Opp. at 37–40.  Although Gonzalez objected to an initial proposal to admit a version of Silva's statement, *see* Dkt. 15-1 at 1–2, he did not object to the

---

[3] Insofar as Beniquez makes the related argument that his convictions were against the weight of the evidence, the Court also denies relief.  Pet. at 6.  Even assuming that Beniquez exhausted this claim, such a claim does not present a viable basis for federal habeas relief.  "Unlike a legal sufficiency claim, which is based on federal due process principles, a weight of the evidence argument is a pure state law claim grounded in CPL § 470.15(5)." *Dixson v. Lamanna*, No. 18 Civ. 8285 (KPF) (SN), 2022 WL 19180, at *23 (S.D.N.Y. Jan. 3, 2022) (internal quotation marks omitted); *see, e.g.*, *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) ("[T]he argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus[].");  *Santiago v. Keyser*, No. 19 Civ. 04020 (LJL) (VF), 2022 WL 2917493, at *10 (S.D.N.Y. May 24, 2022) ("It is well established that weight-of-the-evidence claims are purely state-law claims and are therefore not cognizable on habeas review."), *report and recommendation adopted*, 2022 WL 2916690 (S.D.N.Y. July 25, 2022).  And Beniquez's arguments in support of this claim—which largely argue that Quijano's testimony was not credible—are "likewise not reviewable in habeas proceedings since credibility determinations are the province of the jury." *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006).

version ultimately presented.  *See id.* at 1–6, 66–68.  And Beniquez did not object to any version of Madden's testimony as to Silva's statement—the initial version proposed by the Government, the second version proposed by the court, or the version ultimately elicited.  *See id.* at 1–6.  Quite the contrary, as the State points out, Beniquez's counsel attempted to leverage Madden's sanitized testimony, by suggesting that the person who had given Silva the instruction was another Aztecs member, Manny Falquez, who had been assigned to drive the getaway car from the attack, *id.* at 159–60, and whose photo, with long braids, had been admitted into evidence before Madden testified as to Silva's statement, *id.* at 281.  *See* Opp. at 40.  Exploiting this fact, Beniquez's counsel stated that "Falquez is the picture of the guy interestingly with long braids here" making "Silva's statement . . . important."[4]  Dkt. 15-1 at 334.

It was on direct appeal that Beniquez argued, for the first time, that Madden's testimony as to Silva's statement violated his confrontation clause rights.  *See* Dkt. 13-1 at 55–60.  The Appellate Division rejected that claim for three reasons.  It held that Beniquez's "evidentiary arguments are unpreserved," and as "alternative holding[s]," that these failed "on the merits," and that any error in these was harmless.  *Beniquez I*, 176 A.D.3d at 407.

Beniquez's challenge to the testimony about Silva's statement is foreclosed from federal habeas review because, like much of his challenge to evidentiary sufficiency, it is procedurally barred by the absence of a contemporaneous objection.  *See, e.g.*, *Webb v. LaManna*, No. 19 Civ. 5164 (BMC), 2019 WL 4752375, at *3–4 (E.D.N.Y. Sept. 30, 2019) (holding confrontation

---

[4] The record is silent as to the length of Beniquez's hair in September 2009.  Notably, the State made the same point in opposition to Beniquez's direct-appeal challenge to the receipt of Madden's testimony, noting that Silva's sanitized statement, particularly as commented upon by Beniquez's counsel, directed suspicion away from Beniquez and toward Falquez.  Dkt. 13-2 at 73–74.  Beniquez has not responded to that argument, including to suggest that he, too, had long hair in September 2009.

clause claim in § 2254 petition procedurally barred under contemporaneous objection rule),

*appeal dismissed*, No. 19-3787 (2d Cir. Feb. 6, 2020); *People v. Kinard*, 187 A.D.3d 936, 936

(2d Dep't 2020) (applying contemporaneous objection rule to deny confrontation clause

argument in § 2254 petition, and citing Section 470.05), *leave to appeal denied*, 36 N.Y.3d 973

(2020); *People v. Webb*, 163 A.D.3d 880, 881 (2d Dep't 2018) (same).  And, as with his

challenge to evidentiary sufficiency, Beniquez has not shown cause and prejudice, or a

miscarriage of justice, so as to excuse his default.  *See Bousley*, 523 U.S. at 623–24.

    In any event, if had there been no default, and had receipt of Madden's testimony

violated the confrontation clause,[5] Beniquez's claim would still fail because, as the Appellate

Division recognized, any error was harmless.  *See Beniquez I*, 176 A.D.3d at 407.  Federal courts

review state-court harmless error findings under a two-step standard.  *See Krivoi v. Chappius*,

No. 21-2934-PR, 2022 WL 17481816, at *3 (2d Cir. Dec. 7, 2022).  Under the first, "when a

state court has found a constitutional violation to be harmless beyond a reasonable doubt (by

applying the harmless error standard from *Chapman v. California*, 386 U.S. 18 (1967)), a habeas

petitioner must show that an error had a 'substantial and injurious' effect or influence on the

jury's verdict."  *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 622–23 (1993)).  Under the

second step, federal courts apply § 2254(d)(1).  *See Brown v. Davenport*, 142 S. Ct. 1510, 1520

---

[5] Given the other impediments to this claim, the Court does not have occasion to resolve whether there was such a violation.  The State acknowledges that Silva's statement was testimonial and that Silva was not available for cross-examination.  *See Michigan v. Bryant*, 562 U.S. 344, 359–65 (2011) (statement made during police interrogation nontestimonial if "primary purpose" was to enable police to meet an ongoing emergency, but testimonial if such purpose was to establish facts of past events); *Crawford v. Washington*, 541 U.S. 36, 52 (2004) ("Statements taken by police officers in the course of interrogations are also testimonial[].").  Its basis for disputing that there was a confrontation clause violation is that Silva's sanitized statement, as elicited, directed suspicion *away* from Beniquez and onto another Aztecs member, as reviewed above.  *See* Opp. at 40; *cf. United States v. Vargas*, 803 F. App'x 529, 532 (2d Cir. 2020) (no confrontation clause violation where, in light of nature of testimony, witness was not "a witness against" defendant).

(2022).  The petitioner thus "must prevail under the *Brecht* 'substantial and injurious' standard, *and* he must show that the state court's harmless error determination was an unreasonable application of federal law as determined by the Supreme Court[]."  *Krivoi*, 2022 WL 17481816, at *3 (emphasis in original) (discussing *Brown*).

Beniquez's challenge to the Appellate Division's harmless error finding fails at the first step.[6]  Far from prejudicing Beniquez, the sanitized version of Silva's statement, if anything, assisted him.  *See* Opp. at 40.  As evidenced by Brackley's closing argument, the elimination of Beniquez as the cited speaker gave Beniquez's counsel an opportunity for misdirection.  *Id.*  In any event, to the extent the sanitized statement that did not mention Beniquez might have been nonetheless construed to support that Beniquez had had some involvement in the planning of the retaliatory attack, there was ample alternative evidence of this point, including witness testimony and corroborative cell site evidence.  *See, e.g.*, *Krivoi*, 2022 WL 17481816, at *3–4 (denying § 2254 petition under *Brecht* standard where erroneous admission of out-of-court testimonial statement was harmless; "wrongly admitted evidence was of very limited importance, and the prosecution's case was strong even without it"); *Grant v. Racette*, No. 21-1888-CV, 2022 WL 17574468, at *2 (2d Cir. Dec. 12, 2022) (affirming denial of § 2254 petition where wrongly admitted testimony was not crucial to prosecution's case, cumulative of other testimony, and supported by "significant evidence linking [petitioner] to the crime"); *Moreno-Gratini*, 2022 WL

---

[6] The parties submitted their briefs before the Supreme Court's decision in *Brown*, 142 S. Ct. at 1520.  But the *Brecht* component of *Brown*'s two-part test predated *Brown*; thus, the AEDPA standard added by Brown "is of no relevance here."  *Krivoi*, 2022 WL 17481816, at *3 n.3 (affirming denial of § 2254 petition where briefing filed before *Brown* decision); *see also* Opp. at 36 n.18 (noting pending *Brown* appeal and arguing that Beniquez failed to satisfy both the *Brecht* and AEDPA standards).

1425712, at *9 (statement not prejudicial where it was cumulative of other evidence). Beniquez thus has not shown that excluding the statement would have affected the trial's outcome.

The Court thus denies Beniquez's § 2254 petition, to the extent it is based on a challenge to Madden's testimony regarding Silva's out-of-court statement.

### C.    Challenges to Prosecutor's Jury Addresses

Beniquez next asserts that he was denied a fair trial by the prosecutor's opening and closing statements. These, he argues, improperly: (1) inflamed the jury's emotions; (2) misstated evidence, including by implying that Beniquez was a gang member, and overstating the probative value of DNA and cell site location information evidence; and (3) vouched for Quijano's credibility. Pet. at 6. The State argues that this claim is both procedurally defaulted and meritless. Opp. at 28–35. The State is correct on both grounds.

As to the former, Beniquez did not object to the prosecutor's jury addresses at trial. Dkt. 15 at 413–27 (opening statements); Dkt. 15-1 at 314–45, 363–82 (closing statements); *see also* Opp. at 33 n.15.[7] Nor did Beniquez pursue such claims in his direct appeal, in which he was represented by new counsel. *See* Dkt. 13-1 at 37–42 (objection to prosecution's conduct only in connection with offer of evidence). Beniquez first raised arguments as to the prosecutor's closing statement in his Article 440.10 motion. Article 440.10 Motion at 35–39. There, he argued that the prosecution improperly "sought to stir up sympathy for the victim and his family

---

[7] Gonzalez's counsel did object to several aspects of the prosecution's closing argument, but on grounds particular to Gonzalez. These included objections to the prosecutor's statements to the effect that (1) an exculpatory inference should not be drawn from the fact that cell cite location evidence did not situate Gonzalez at the Baruch Houses; this evidence merely reflected, the prosecution argued, that "[we] couldn't find his cell phone number," Dkt. 15-1 at 379, and (2) Gonzalez, having lied about why he was at the Baruch Houses, could not be assumed to have told the truth in reporting his cell phone number to law enforcement. *See also id.* at 376 (objecting to testimony about when Gonzalez moved to New Jersey). The court overruled these objections. *Id.* at 376, 379–80.

by having the father of the victim take the stand when he did not witness the crime," and through

the following two statements in summation:

> The people who gave Mr. Herrera a knife expected Mr. Herrera to use it.  Mr.
> Herrera did, use it.  There's only one way to use a knife, right?  There's only one
> way to use it.  It's to stab somebody.  When you stab somebody in the area Mr.
> Herrera stabbed Glen Wright it's natural to think they are going to die and that's
> what happened.

and

> There's a lot of charges.  And there's a fair amount of evidence.  I think the best
> way to organize is this:  You guys go back into the jury room, first figure out intent.
> What did they intend?  What happens when you give someone a knife and tell them
> I'm tired of putting in all this work, someone has to step up, and you point them in
> the direction of a defenseless kid washing his grandmother's windows, what
> happens?  The person who uses the knife and the person that they use the knife on
> dies.

*Id.* at 36 (citing Dkt. 15-1 at 380–81).  In his Article 440.10 motion, Beniquez did not otherwise

take issue with the prosecution's closing argument, or in any way take issue with his opening.

Although the state supreme court was not explicit as to Beniquez's claim of summation

misconduct, its denial of the Article 440.10 motion is best read as rejecting this claim based on a

form of state law procedural default.  Under New York law, a defendant is permitted only one

direct appeal.  *See* N.Y. Ct. App. R. 500.20 (a)(2); *Dasney v. People of the State of N.Y.*, No. 15

Civ. 5734 (RJS), 2017 WL 253488, at *5 (S.D.N.Y. Jan. 19, 2017) (citing N.Y. Ct. App. R.

§ 500.20).  The appellant must raise record-based claims, like a challenge to jury addresses, by

direct appeal rather than by a collateral motion in state court.  And CPL § 440.10(2)(c) requires

the state court to deny a post-appeal motion to vacate a judgment when,

> [a]lthough sufficient facts appear on the record of the proceedings underlying the
> judgment to have permitted, upon appeal from such judgment, adequate review of
> the ground or issue raised upon the motion, no such appellate review or
> determination occurred owing to the defendant's unjustifiable failure to take or
> perfect an appeal[].

As the Second Circuit has explained, "the purpose of this rule is to prevent Section 440.10 from being employed as a substitute for direct appeal when the defendant was in a position to raise an issue on appeal or could readily have raised it on appeal but failed to do so." *Fulton v. Graham*, 802 F.3d 257, 263 (2d Cir. 2015) (internal quotation marks and alterations omitted). This rule is well-established and regularly applied. *See, e.g.*, *id.*; *Sweet v. Bennett*, 353 F.3d 135, 139 (2d Cir. 2003) ("New York law requires a state court to deny a motion to vacate a judgment based on a constitutional violation where the defendant unjustifiably failed to argue the constitutional violation on direct appeal despite a sufficient record."); *Weston v. Capra*, No. 18 Civ. 05770 (PMH) (JCM), 2022 WL 1811161, at *10 (S.D.N.Y. Apr. 13, 2022), *report and recommendation adopted*, 2022 WL 2914506 (S.D.N.Y. July 25, 2022), *appeal dismissed*, No. 22-1688, 2022 WL 18207319 (2d Cir. Dec. 15, 2022), *cert. denied*, 143 S. Ct. 831 (2023); *O'Kane v. Kirkpatrick*, No. 09 Civ. 05167 (HB) (THK), 2011 WL 3809945, at *7 (S.D.N.Y. Feb. 15, 2011) ("[A]ll claims that are record-based must be raised in a direct appeal. . . . It is only when a defendant's claim hinges upon facts outside the trial record, that he may collaterally attack his conviction by bringing a claim under CPL § 440.10." (internal citations omitted)), *report and recommendation adopted*, 2011 WL 3918158 (S.D.N.Y. Aug. 25, 2011).

Against this backdrop, the state supreme court's citation to the *Beniquez I* decision disposing of Beniquez's direct appeal—and which did not challenge the prosecution's jury addresses—is best read as denying the Article 440.10 motion on the grounds that the bases for that motion were required to have been brought in a direct appeal. Such a procedural default would supply an independent and adequate state law ground on which to deny relief. *Beard*, 558 U.S. at 55; *see also* Opp. at 31. And although a federal habeas court generally presumes that a federal claim was adjudicated on the merits "[w]hen a state court rejects a federal claim without

expressly addressing [it]," "that presumption can in some limited circumstances be rebutted." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). Chief among these is when the State "show[s] that the federal claim should be regarded as procedurally defaulted." *Id.* at 302. Such is the case here, insofar as Beniquez's failure to raise these claims on direct appeal clearly worked such a default. That analysis equally applies to Beniquez's challenge to the prosecution's closing argument, and to its opening statement, the latter of which he has never before pressed, even in the 440.10 motion. And Beniquez has not argued cause and prejudice for such a default—nor does the record make any apparent. *Cf. Sweet*, 353 F.3d at 141 n.7 ("[Petitioner] could not use ineffective assistance of appellate counsel as 'cause' for his procedural default" where no such ineffective assistance claim brought in state court.). Nor, as noted, has he shown actual innocence. *Dixon*, 293 F.3d at 81. Accordingly, federal habeas review is foreclosed as to the prosecutor's jury addresses.

In any event, were it proper to reach the merits, Beniquez's claim would fail there, too. As a general rule, "prosecutorial misconduct cannot give rise to a constitutional claim unless the prosecutor's acts constitute 'egregious misconduct.'" *Miranda v. Bennett*, 322 F.3d 171, 180 (2d Cir. 2003) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647–48 (1986)); *see also Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) (standard for reversal of a conviction based on improper prosecutorial comments is extremely high). "A single potentially inappropriate remark in an extended summation that is subject to '[c]onflicting inferences' does not violate due process if 'it is by no means clear that the jury . . . would seize such a comment out of context and attach [a prejudicial] meaning to it,' even if the prosecutor could fairly be criticized for speaking thoughtlessly." *Eyck v. Lee*, No. 19 Civ. 6924 (MKV) (RWL), 2020 WL 8671942, at *14 (S.D.N.Y. Oct. 9, 2020) (alterations in original) (quoting *Donnelly*, 416 U.S. at 643–44).

"Habeas relief is not appropriate when there is merely a 'reasonable possibility' that trial error contributed to the verdict." *Bentley*, 41 F.3d at 824.  Instead, Beniquez must demonstrate "actual prejudice." *Id.*

Beniquez has not shown actual prejudice here.  Courts assess claims of actual prejudice based on prosecutorial misconduct by "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998).  Beniquez has not pointed to specific assertedly prejudicial remarks in the opening statement.  To the extent his Article 440.10 motion identified any excerpts of the prosecutor's closing statement, the two excerpts reproduced above were fair commentary on the evidence.  And even assuming *arguendo* that they were improper, they "were short and fleeting, and thus much less likely to have had a substantial effect on the jury's verdict." *Smith v. Graham*, No. 10 Civ. 3450 (JPO) (THK), 2012 WL 2428913, at *14 (S.D.N.Y. May 7, 2012), *report and recommendation adopted*, 2012 WL 2435732 (S.D.N.Y. June 27, 2012).  Moreover, the trial court, although not asked to intercede as to these arguments, repeatedly reminded the jury that "[w]hat any attorney says is not evidence." *See, e.g.*, Dkt. 15 at 431, 433; *see also id.* at 458–59.  There is no non-speculative reason to believe that any overreach by the prosecution in the remarks at issue was unduly influential, particularly given the weighty direct and circumstantial evidence of Beniquez's guilt. *See*, *e.g.*, *Eyck*, 2020 WL 8671942, at *14; *King v. Greiner*, No. 02 Civ. 5810 (DLC) (AJP), 2008 WL 4410109, at *32–33 (S.D.N.Y. Sept. 26, 2008) (statement that defendant was a "career criminal" who "lived his entire life breaking the law" unlikely to have swayed jury given other evidence), *report and recommendation adopted*, 2009 WL 2001439 (S.D.N.Y. July 8, 2009), *aff'd*, 453 F. App'x 88 (2d Cir. 2011); *Salcedo v. Artuz*, 107 F. Supp. 2d 405, 416 (S.D.N.Y. 2000) (habeas claim failed

where prosecutor did not assert personal opinion as to witness credibility but merely summarized

testimony of witnesses and argued that prosecution witnesses were more credible).[8]

The Court thus denies Beniquez's § 2254 petition to the extent it is based on the

prosecutor's opening and closing statements.

### D.      Ineffective Assistance of Counsel Challenges

Beniquez next claims a denial of effective assistance of counsel.  He asserts that his trial

counsel erred in that he (1) "did not know the law concerning hearsay and co-conspirator

statements" and therefore failed to object to inadmissible evidence; and (2) did not object to

Beniquez's being sentenced as a "Second Violent Felony Offender" based on a prior conviction.

Pet. at 7.  The State counters that, insofar as Beniquez's faults counsel for not objecting to the

admission of certain statements, Beniquez did not exhaust that ineffective assistance claim in

state court, and that all parts of his ineffective assistance claim are meritless.  Opp. at 44–50.

To exhaust an ineffective assistance of counsel claim, a petition must have "asserted in

state court the specific conduct giving rise to the claim."  *Moreno-Gratini*, 2022 WL 1425712, at

*7; *see Caballero v. Keane*, 42 F.3d 738, 740 (2d Cir. 1994) ("To reach the merits of an

ineffective representation claim, all of the allegations must have been presented to the state

courts." (alterations omitted)); *Castillo v. Walsh*, 443 F. Supp. 2d 557, 566 (S.D.N.Y. 2006)

---

[8] To the extent Beniquez claims that the prosecution's closing argument improperly bolstered Quijano's credibility, that claim also fails on its merits.  In his Article 440.10 motion, Beniquez faulted the prosecution for ostensibly characterizing the plea deal as not conditioning leniency on a conviction.  In fact, Beniquez states, for Quijano to get maximum leniency, "everyone must be convicted."  Article 440.10 Motion at 38.  The trial transcript does not reflect any such misstatement—or improper bolstering.  It reflects that the prosecution, on redirect examination, asked Quijano whether the cooperation agreement required convictions for him to benefit— Quijano responded that it did not, Dkt. 15-1 at 285—and that the prosecution so inquired only after Beniquez's counsel, on cross examination, had opened the door to this subject, *see id.* at 253 (Q:  "[Y]our cooperation isn't any good unless people get found guilty, get convicted, right? A: "Correct.").

(same).  On direct appeal, Beniquez argued that his trial counsel had been ineffective, under federal and state law, for failing to object to hearsay and co-conspirator statements.  Dkt. 13-2 at 60–63.  The Appellate Division rejected that claim as "unreviewable on direct appeal because it involve[d] matters not reflected in, or fully explained by, the record."  *Beniquez I*, 176 A.D.3d at 407.  The Court noted that because "[Beniquez] ha[d] not made a CPL 440.10 motion," "the merits of the ineffectiveness claim may not be addressed on appeal."  *Id.*  When Beniquez later made a 440.10 motion, however, he did not argue that his counsel had been ineffective as to these actions.  His claim of ineffectiveness there was based only on trial counsel's failure to challenge his sentence as excessive.  Article 440.10 Motion at 40.

Accordingly, to the extent Beniquez's present ineffective assistance claim faults his trial counsel for ignorance of evidentiary rules, for failing to object to the admission of testimony, or for failing to challenge the court's sentencing of him as a predicate felon, it is unexhausted and an improper basis for a federal habeas review.  *See, e.g.*, *Rios v. Miller*, No. 17 Civ. 02256 (ALC), 2020 WL 4003607, at *3 (S.D.N.Y. July 15, 2020) (ineffective assistance claim unexhausted where it was raised only on direct appeal, even though Appellate Division had held, in the alternative, that "to the extent the existing record permits review, . . . defendant received effective assistance under state and federal standards"); *Polanco v. Ercole*, No. 06 Civ. 1721 (RMB) (DFE), 2007 WL 2192054, at *7 (S.D.N.Y. July 31, 2007) (same; adopting recommendation and report); *see also Fulton*, 802 F.3d at 263 ("[U]nder New York law, when, as here, a defendant's complaint about counsel is predicated on factors such as advice or preparation that do not appear on the face of the record, the defendant *must* raise his or her claim via a CPL 440.10 motion." (internal quotation marks and alteration omitted)); *People v. Peque*, 22 N.Y.3d 168, 202 (2013) (same).

In any event, even if Beniquez had exhausted all dimensions of his present ineffective assistance claim, it fails on the merits.  The nature of Beniquez's critiques is such that the Court can assess these based on the trial record.  *Compare Sweet*, 353 F.3d at 140 (ineffective assistance claim based on alleged failures to object to charging counts "was particularly well-established in the trial record"), *with Fulton*, 802 F.3d at 264 (declining to consider ineffective assistance claim relating to rejection of plea offer where "trial record does not clearly reflect the adequacy of counsel's advice").  And Beniquez has not pointed to any reason that a new evidentiary hearing would have been required to develop his claims, whether based on the failure to object to hearsay and co-conspirator statements, *Sweet*, 353 F.3d at 140, or, as discussed in the ensuing section, on his classification at sentencing as a second violent felony offender.

"[T]o prove ineffective assistance, [a petitioner] must show (1) 'that counsel's representation fell below an objective standard of reasonableness'; and (2) 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2008) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)); *Massaro v. United States*, 538 U.S. 500, 501 (2003) ("[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy and that the error was prejudicial.").  "A defense counsel's performance is unreasonable when it is so deficient that it falls outside the 'wide range of professionally competent assistance.'"  *Kovacs v. United States*, 744 F.3d 44, 50 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 690).  "[T]he record must demonstrate that 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'"  *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (quoting *Strickland*, 466 U.S. at 687).

31

Beniquez has not done so here.  As the State notes, much of Quijano's testimony was not

hearsay at all.  Some parts described non-expressive acts; other parts recounted statements of co-

conspirators excluded from the definition of hearsay.  And to the extent Quijano recounted

hearsay statements, such fell within well-established hearsay exceptions.  Neither in the instant

Petition nor on direct appeal has Beniquez identified specific statements that were improperly

admitted.  Pet. at 7; Dkt. 13-1 at 60–63.  On direct appeal, the statements recounted by Quijano

that Beniquez challenged as inadmissible hearsay were held properly received.  *See* Dkt. 13-1 at

48–49.  Quijano's testimony as to the gang's hierarchy, rules, structure, and leaders, including

Beniquez, was not inadmissible hearsay.  Quijano's testimony to this effect instead was based on

his personal experience and observations.  *See* Fed. R. Evid. 801(c); *see also United States v.*

*Castro*, 411 F. App'x 415, 418 (2d Cir. 2011) (former gang members' testimony as to gang's

practices and their experience with the organization not hearsay and admissible, including as lay

opinion testimony under Federal Rule of Evidence 701).  Quijano's testimony as to non-assertive

conduct he observed at the Tompkins Square Park meeting—namely, Esquilin's demeanor, the

fact that Esquilin, Gonzalez, and Beniquez had a private conversation before Esquilin spoke to

the group, and the physical locations of those men—likewise did not implicate the hearsay rules.

And Quijano's testimony as to statements Beniquez made to him—such as Beniquez's

instructions to travel to the Baruch Houses in separate groups and, after the attack, not to return

there—was not hearsay because Beniquez was a party opponent.  *See* Fed. R. Evid.

801(d)(2)(A); *see also United States v. Aspinall*, 389 F.3d 332, 341 (2d Cir. 2004).  In any event,

these statements were predominantly not offered for the truth of the matters asserted, but as

verbal acts reflecting Beniquez's authority to give directions, which tended to show his guilt on

the murder and conspiracy charges.  *Cf. United States v. Stein*, No. S1 0.0888 LAK, 2007 WL

3009650, at *4 (S.D.N.Y. Oct. 15, 2007); *People v. Thompson*, 186 A.D.2d 768, 768 (2d Dep't 1992) (co-defendant's statements not hearsay; such constituted, *inter alia*, verbal acts indicative of conspirators' "acting in concert"); *see also* Fed. R. Evid. 803(3).[9]

As to Beniquez's claim that he was denied effective representation because he was improperly sentenced as a second violent felony offender and his counsel failed to object to that asserted error, it also fails on its merits.  For the reasons discussed in the following section, the record reveals that Beniquez was correctly sentenced as a second felony offender.  *See infra* Section III.E.  Accordingly, any objection by Brackley to this classification would have been groundless.

Under these circumstances, where objections would have been meritless, trial counsel cannot be found ineffective for failing to object.  *See, e.g.*, *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) ("[T]he failure to include a meritless argument does not fall outside the wide range of professionally competent assistance" under *Strickland* (internal quotation marks omitted)); *Martin v. Perez*, No. 13 Civ. 2413 (VB) (PED), 2016 WL 5815841, at *14 (S.D.N.Y. Feb. 18, 2016) ("[B]ecause [the witness's] testimony fell within the co-conspirator exception to the hearsay rule, trial counsel had no basis to object on hearsay grounds . . . ; [t]herefore, Petitioner has failed to establish that trial counsel was ineffective for not raising this meritless claim."), *report and recommendation adopted as modified,* 2016 WL 5720820 (S.D.N.Y. Oct. 3,

---

[9] To the extent the Petition can be construed to fault counsel for failing to object to Silva's sanitized statement, that claim also fails to secure relief.  As discussed above, Beniquez has not shown, *inter alia*, that this evidence prejudiced him at trial; on the contrary, the trial record reflects a strategic basis for not objecting, in that Beniquez's counsel sought to gain mileage from this statement by casting it as made by a different person consistent with the description used in the sanitized statement.  *Cf. Singleton v. Davis*, 308 F. App'x 560, 562 (2d Cir. 2009) (no ineffective assistance where trial counsel chose not to object to inadmissible hearsay as part of strategy designed to highlight for the jury an inconsistency between testimony and evidence).

2016); *McPherson v. Greiner*, No. 02 Civ. 2726 (DLC) (AJP), 2003 WL 22405449, at *22

(S.D.N.Y. Oct. 22, 2003 ) ("Counsel cannot be found to be ineffective for failing to assert a

meritless objection.").

Accordingly, the Court denies Beniquez's ineffective assistance of counsel claim to the

extent it is based on a failure to object to ostensibly inadmissible statements.

### E.     Challenges to the Sentence

Finally, Beniquez seeks § 2254 relief on the ground that he was improperly sentenced as

a second violent felony offender and that his resulting sentence was harsh and excessive.  Pet. at

8.  The State counters that Beniquez failed to exhaust any federal challenge to his sentence and

that, in any event, his sentence was lawful.  Opp. at 43–48.  The State is, again, correct.

On direct appeal, Beniquez cited only state law in arguing that his sentence was unduly

harsh.  *See* Dkt. 13-1 at 64–69; *see also* Dkt. 13-3.  Denying that motion, the Appellate Division

found "no basis for reducing [Beniquez's] sentence."  *Beniquez I*, 176 A.D.3d at 407.  In

Beniquez's *pro se* Article 440.10 motion, he argued for the first time that the trial court had

incorrectly designated him a second violent felony offender.  But that claim was based solely on

state law, as it cited exclusively to state case authority and did not reference the federal

Constitution or case law.  *See* Article 440.40 Motion at 39–40.

A petitioner who articulates claims exclusively in state law terms does not present a

federal claim.  *See, e.g.*, *Rodriguez v. Lee*, No. 19 Civ. 8398 (PAE) (SLC), 2023 WL 2473334, at

*11 (S.D.N.Y. Mar. 13, 2023) (federal constitutional claim unexhausted where state brief cited

only state law); *Jefferies v. Sheahan*, No. 15 Civ. 2890 (PKC) (SN), 2016 WL 3660767, at *8

(S.D.N.Y. Mar. 10, 2016) (same), *report and recommendation adopted*, 2016 WL 3661546

(S.D.N.Y. July 5, 2016); *Pham v. Kirkpatrick*, 209 F. Supp. 3d 497, 511–13 (N.D.N.Y. 2016)

(federal claim unexhausted where, *inter alia*, petitioner argued solely in terms of state law); *Kimbrough v. Bradt*, 949 F. Supp. 2d 341, 362–63 (N.D.N.Y. 2013) (same); *Jones v. Annucci*, 124 F. Supp. 3d 103, 116 (N.D.N.Y. 2015) (same); *Glisson v. Mantello*, 287 F. Supp. 2d 414, 419–20 (S.D.N.Y. 2003) (brief reference to state court decision did not give Appellate Division notice that petitioner was raising federal constitutional issue); *Oliver v. Greiner*, No. 01 Civ. 4223 (DC), 2002 WL 1758915, at *3 (S.D.N.Y. July 30, 2002) (federal claim unexhausted where petitioner cited no federal case law and argued solely in terms of New York statutory and case law). *Contra Rosa v. McCray*, 396 F.3d 210, 219 (2d Cir. 2005) (petitioner exhausted state remedies where he relied below on federal constitutional cases, used terms "so particular as to call to mind a specific right protected by the [federal] Constitution," and explicitly claimed a violation of the U.S. Constitution). Beniquez's failure to present a federal claim here thus denied the state courts an opportunity to address and correct the alleged federal constitutional violations. *See Picard v. Connor*, 404 U.S. 270, 275 (1971).

Accordingly, because AEDPA required Beniquez to "fairly present" his federal constitutional challenges to his sentence and he did not do so, his sentencing challenges in his § 2254 petition must be rejected as unexhausted. *See* 28 U.S.C. §§ 2254(b)(1), (c); *see, e.g.*, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (under AEDPA, state prisoner must exhaust available state remedies, which requires "fairly present[ing]" a claim and its federal nature to each appropriate state court, to "giv[e] the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights" (internal quotation marks omitted)). For similar reasons, these claims are procedurally defaulted, insofar as, under New York law, the time to bring such challenges was on direct appeal—state collateral review being unavailable for claims that relate "solely to the validity of the sentence," *Campbell v. Smith*, No. 16 Civ. 8083 (JMF),

2017 WL 5508533, at *2 (S.D.N.Y. Nov. 16, 2017) (citing CPL§ 440.10(2))—and Beniquez

failed to do so.

      In any event, even if Beniquez's § 2254 challenges to his sentence had been preserved

and were proper, these challenges fail on the merits.  To the extent Beniquez claims that he was

sentenced as a second violent felony offender, Pet. at 8, the record refutes that.  It reflects that he

was sentenced—correctly—as a second felony offender.  The statement of predicate felony

conviction that the prosecution supplied the Court in advance of sentencing correctly described

Beniquez a predicate felon.  It cited the New York statute applicable to nonviolent felons, not the

statute applicable to persons eligible to be sentenced as second *violent* felony offenders.  *See*

Dkt. 13-16 (citing NYPL § 70.06); *see also* Opp. at 54 n.27.  Consistent with that, the sentencing

transcript reflected that Beniquez was adjudicated as a second felony offender under NYPL

§ 70.06, based on his prior conviction for attempted criminal possession in the third degree.  Dkt.

15-1 at 453–54 (sentencing transcript, reflecting court clerk reading excerpt from predicate

conviction statement into record and referring only to "felony").  To the extent that erroneous

references in post-sentencing litigation were made to Beniquez's having been a "violent"

predicate offender, those descriptive inaccuracies by definition could not have affected his

sentence.  *See* Opp. at 51 n.24.

      Notwithstanding Beniquez's characterization of his sentences as harsh and excessive,

these do not support a federal claim of error.  Beniquez's sentences were within the ranges

prescribed for second felony offenders by New York statutes.  And the trial court, exercising its

discretion under NYPL § 70.25, imposed concurrent sentences on the four counts of conviction.

Dkt. 15-1 at 465.  On the two assault counts—for first-degree assault, NYPL § 120.10, and first-

degree gang assault, NYPL § 120.07—Beniquez received a determinate sentence of 20 years'

imprisonment, followed by five years' supervision.  That sentence is within the statutory range for each offense of nine to 25 years for a second felony offender.  *Compare* NYPL § 70.02(1)(a) (defining assaults as class B violent felony offenses), *and* NYPL § 70.06(3)(b) (defining range for second felony offenders), *with* NYPL § 70.04 (sentence range for second violent felony offenders who have committed a class B felony is 10 to 25 years).  On the count for second-degree conspiracy, NYPL § 105.15, Beniquez received an indeterminate sentence of four-and-a-half to nine years, likewise lawful for a second-felony offender.  *See* NYPL § 70.06.  And on the count of second-degree murder, which is a class A felony offense under NYPL § 125.25, the sentence of 20 years-to-life, too, was lawful.[10]  New York does not distinguish between predicate or first-time offenders for this offense.  *See* NYPL § 70.00; *see also* NYPL § 70.06 (excluding class A offenses).  Finally, Beniquez's sentence was within the statutory range for persons convicted of class A felonies:  They face a maximum sentence of life imprisonment, with the minimum period of imprisonment to be determined and specified by the court, as occurred here.  Dkt. 15-1 at 465.  Because Beniquez's sentences thus all were authorized by statute, he is not entitled to habeas relief, as "no federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *see, e.g.*, *Ennis v. Artus*, No. 09 Civ. 10157 (DAB), 2011 WL 3585954, at *22 (S.D.N.Y. Aug. 12, 2011) (sentence not harsh or excessive where within state statutory limits), *report and recommendation adopted*, 2012 WL 3957046 (S.D.N.Y. Sept. 10, 2012); *Galberth v. New York*, No. 06 Civ. 5728 (NRB), 2007 WL 633953, at *5 (S.D.N.Y. Feb. 28, 2007) (same).

---

[10] Gonzalez, who was sentenced to a 15-year prison term followed by five years' supervision, was convicted of a different crime: manslaughter in the first degree.  *See* Dkt. 15-1 at 458–59.

## CONCLUSION

For the foregoing reasons, the Court denies Beniquez's February 18, 2021 petition for a

writ of habeas corpus.[11]

---

[11] In response to the Court's order lifting the stay of the instant case, which had been imposed while Beniquez's first Article 440.10 state proceedings were pending, Dkt. 24, Beniquez filed a letter stating, *inter alia*: "In ordinary court practice, this Court had to advise me that the order was revoked and that I had up to a certain date to file the amended petition with the issues that were raised in the CPL § 440.10 along with the grounds that were already filed." Dkt. 25. Although the purpose of this letter is unclear, the Court construes it as a request for leave to amend the Petition. The Court denies that request. Federal Rule of Civil Procedure 15 governs motions to amend habeas petitions under § 2254. *See Littlejohn v. Artuz*, 271 F.3d 360, 363 (2d Cir. 2001). It provides for amendments as a matter of course within 21 days of service or 21 days after service of a responsive pleading, but it does not do so indefinitely—as Beniquez's letter appears to imply—and those periods long ago passed. Fed. R. Civ. P. 15(a)(1)(A). To the extent that district courts retain discretion after the Rule 15 period to permit amendment, courts "retain the discretion to deny that leave in order to thwart tactics that are dilatory, unfairly prejudicial or otherwise abusive, or where amendment would be futile." *McCloud v. Perez*, No. 17 Civ. 827 (AJN) (KNF), 2018 WL 2021677, at *2 (S.D.N.Y. Apr. 12, 2018) (internal citations and quotation marks omitted). Here, for the reasons reviewed above, Beniquez's claims durably fail on the merits, such that amendment would be futile. *See, e.g.*, *id.* (denying leave to amend where amendment would be futile); *Cruz v. Bureau of Prisons*, No. 10 Civ. 5460 (SHS), 2014 WL 12648510, at *3 (S.D.N.Y. Mar. 24, 2014) (same), *aff'd sub nom. Cruz v. Walsh*, 633 F. App'x 794 (2d Cir. 2015); *see also Ramos-Nunez v. United States*, No. 14 Cr. 102 (VSB), 2019 WL 1300811, at *3 n.4 (S.D.N.Y. Mar. 21, 2019) (same, with § 2255 petition).

The Court declines to issue a certificate of appealability.  Beniquez has not made a substantial showing of a denial of a federal right.  Appellate review is therefore not warranted. *Love v. McCray*, 413 F.3d 192, 195 (2d Cir. 2005); 28 U.S.C. § 2253.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith.  Therefore, *in forma pauperis* status is denied for the purpose of an appeal.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

The Clerk of the Court is respectfully directed to terminate all pending motions, to mail a copy of this order and appeal instructions to petitioner at his address of record, to send a copy of appeal instructions to respondent, and to close this case.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: June 12, 2023
New York, New York